IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EPHRIM MARSHALL BRALEY, III, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:20-CV-3207-X-BH |
| | § | |
| KILOLO KIJAKAZI, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for social security benefits should be **AFFIRMED.**

## I.    BACKGROUND

On November 28, 2017, Ephrim Marshall Braley, III (Plaintiff), filed his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, alleging disability beginning on October 23, 2017. (doc. 11-1 at 43.)[2] His claim was denied initially on May 2, 2018, and upon reconsideration on September 17, 2018. (*Id.* at 122-30). After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified at a hearing on July 17, 2019. (*Id.* at 40, 131-32.) On September 26, 2019, the ALJ issued a partially favorable decision finding that Plaintiff was not disabled prior to July 18, 2019, but that he became disabled on that date and continued to be disabled through the date of his decision. (*Id.* at 21-34.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 23, 2019.

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 185.) The Appeals Council denied his request for review on August 24, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-9.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A. Age, Education, and Work Experience

Plaintiff was born on December 25, 1956; he was 62 years old at the time of the hearing. (doc. 11-1 at 42, 75.) He had at least a high school education, could communicate in English, and had past relevant work as a project manager and billing supervisor. (*Id.* at 47, 56-57, 64-65, 79.)

## B. Medical, Psychological, and Psychiatric Evidence

In November 2017, Plaintiff underwent an initial psychological assessment by Ashley Gartner, PsyD (Psychologist). (*Id.* at 437-41.) He appeared well groomed but depressed/sad, and he reported family issues, decreased work performance, and taking prescription anti-depressants. (*Id.* at 438.) He was diagnosed with generalized anxiety disorder, major depressive disorder, recurrent episode, severe, and posttraumatic stress disorder (PTSD). (*Id.* at 439-40.) At the five therapy sessions he attended between December 2017 and January 2018, he reported anxiety and "memory difficulties" due to work stressors and his military experience. (*Id.* at 432-36.) In January 2018, he began feeling "more hopeful" and showed a willingness to use coping strategies. (*Id.*)

In a letter dated January 9, 2018, Psychologist opined that Plaintiff could not function effectively in a work environment because of "significant anxiety" and reported "significant decline" in his cognitive functioning. (*Id.* at 364.) A second letter dated January 25, 2018, reflected her diagnosis of generalized anxiety disorder diagnosis, defined his symptoms as severe, and assigned him a global assessment of functioning (GAF)[3] score of 42. (*Id.* at 302.) No clinical,

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).

laboratory or diagnostic evidence accompanied these letters.

On February 28, 2018, Plaintiff underwent a psychiatric diagnostic evaluation by Rathidevi Reddy, M.D. (Psychiatrist). (*Id.* at 584.) He reported sadness and low motivation, but he enjoyed time with his grandchildren, volunteered, and went to church. (*Id.*) He was diagnosed with major depressive disorder, recurrent severe without psychotic features, as well as anxiety disorder, unspecified, and prescribed Escitalopram Oxalate. (*Id.* at 585.)

On March 14, 2018, Plaintiff reported to Psychiatrist that he did house chores, took afternoon naps, and felt less tired. (*Id.* at 582.) His mental status examination was unremarkable, he was tolerating Escitalopram without any side effects, and he was diagnosed with anxiety disorder and major depressive disorder, recurrent severe without psychotic features. (*Id.*)

Plaintiff attended four therapy sessions between March 2018 and May 2018, and his mental status remained unchanged. (*Id.* at 421-24.) In April 2018, he traveled to Wisconsin. (*Id.*) In April 2018 and May 2018, Plaintiff visited Psychiatrist and reported anxiety, depression, and problems sleeping. (*Id.* at 578-81.) Both times, he was assessed with major depressive disorder and anxiety disorder, although his mood was "slightly better" during the May visit. (*Id.*)

On April 30, 2018, Plaintiff underwent a sleep evaluation by David L. Luterman, M.D. (Sleep Doctor), who noted that he snored, took afternoon naps of 2 to 3 hours, and complained of being sleepy "some" days. (*Id.* at 389-91.) He was assessed with nocturia, obstructive sleep apnea, essential hypertension, depression with anxiety, memory loss, PTSD, osteoarthritis of both knees, and a BMI of 40.0-44.9. (*Id.* at 390.) Sleep Doctor scheduled him for a sleep study and discussed using a continuous positive airway pressure (CPAP) machine to help him sleep better. (*Id.*)[4]

The same day, state agency psychologist consultant (SAPC) Thomas Geary, Ph.D.,

---

[4] The medical record noted that Plaintiff had right knee arthroscopic surgery in 2013. (doc. 11-1 at 389-90.)

completed a Psychiatric Review Technique (PRT) based on Plaintiff's medical records. (*Id.* at 80-81.) He opined that Plaintiff had medically determinable impairments of neurocognitive disorders, depressive, bipolar and related disorders, anxiety, and obsessive-compulsive disorders that did not precisely satisfy the diagnostic criteria for listings 12.02, 12.04, and 12.06, respectively. (*Id.* at 80.) He found that Plaintiff's "B Criteria" were all "moderate" and that the evidence did not establish the presence of the "C Criteria." (*Id.*) He opined that his reported symptoms were partially consistent with the record, his alleged limitations were not "wholly supported" by the medical evidence of record, and the preponderance of evidence indicated that he may be "somewhat" restricted by his symptoms but "not wholly" compromised in his ability to function in a work setting. (*Id.* at 80-81.)

SAPC Geary also completed a mental RFC assessment based on Plaintiff's medical records. (*Id.* at 82-84.) He opined that Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or understand and remember very short and simple instructions, but he was moderately limited in his ability to understand and remember detailed instructions. (*Id.*) Plaintiff was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions and to set realistic goals or make plans independently of others, but he was moderately limited in his ability to respond appropriately to changes in the work setting and to travel in unfamiliar places or use public transportation. (*Id.* at 84.) He concluded that "[d]espite [medically determinable impairment] related symptoms[,] [Plaintiff] is able to understand, remember and carry out detailed, noncomplex instructions, make decisions and concentrate for adequately extended periods, interact appropriately with others and adequately respond to changes." (*Id.*)

On May 3, 2019, Sleep Doctor noted that Plaintiff had submitted to a sleep study and that

his results were pending. (*Id.* at 578-79.) Plaintiff reported that his mood was "slightly better" on the higher doses of his antidepressant; he was assessed with major depressive disorder. (*Id.* at 578.)

On May 17, 2018, Psychiatrist noted that Plaintiff's PET scan was within normal limits, and there were no signs of Alzheimer's disease. (*Id.* at 576.) Plaintiff reported traveling to Rhode Island; he was feeling the same, except with no acute symptoms of depression. (*Id.*) He was using his continuous positive airway pressure (CPAP) machine for sleep apnea, and except for decreased psychomotor activity, a mental status examination was normal. (*Id.*) His diagnoses were continued, and he was doing "fairly well" on Bupropion and Escitalopram. (*Id.*)

At therapy the same day, Plaintiff reported "less energy", forgetfulness, and grooming issues. (*Id.* at 420.) He attended therapy on three occasions between May 24, 2018, and June 4, 2018; each time, he reported hypervigilance and "no changes" in his mental status. (*Id.* at 417-19.)

On May 31, 2018, Sleep Doctor noted that Plaintiff's sleep studies were consistent with moderate obstructive sleep apnea, Plaintiff had been using the CPAP machine for 15 days, and his compliance was "100%". (*Id.* at 386.) He reported that he could "tell the difference with CPAP" and "[wa]s sleeping better" although he was still sleepy during the day. (*Id.*) Sleep Doctor adjusted the pressure on his CPAP machine. (*Id.*) He also complained of knee arthritis. (*Id.*)

In a letter dated June 21, 2018, Psychologist opined that Plaintiff had "severe" concentration deficits and "warrant[ed]" a PTSD diagnosis based on "intrusive" flashbacks and nightmares relating to his "traumatic" military experiences. (*Id.* at 415.)[5] In a clinical record with the same date, she noted Plaintiff's ongoing anxiety. (*Id.* at 416.)

On July 11, 2018, Sleep Doctor noted his continued diagnosis of sleep apnea; Plaintiff was not as sleepy and doing "much better" after his CPAP machine was adjusted. (*Id.* at 383-84.)

---

[5] No clinical, laboratory or diagnostic evidence accompanied the letter.

On a function report dated July 31, 2018, Plaintiff indicated he drove a "few miles a week", no longer participated in social groups, and relied on his wife to cook and manage his appointments. (*Id.* at 268.) He checked boxes indicating he had trouble with concentration, memory, understanding, completing tasks, following instructions, getting along with others, and "bending". (*Id.* at 270.)

On August 27, 2018, SAPC Sallie Boulos-Sophy, Ph.D., completed a PRT based on Plaintiff's medical record. (*Id.* at 94-96.) She confirmed Dr. Geary's findings relating to listings 12.02, 12.04, and 12.06, and to Plaintiff's moderate limitations on the "B Criteria". (*Id.*) She opined that his alleged impairment-related functional limitations and restrictions "cannot reasonably be accepted as consistent" with the evidence in the file. (*Id.*) SAPC Boulos-Sophy also completed a mental RFC assessment based on Plaintiff's medical record. (*Id.* at 97-99.) She confirmed the limitations SAPC Geary found, except she opined that Plaintiff was "not significantly limited" (instead of "moderately limited") in his ability to accept instructions and respond appropriately to criticism from supervisors, and that he was "moderately limited" (instead of "not significantly limited") in his ability to interact appropriately with the public and to set realistic goals or make plans independently of others. (*Id.*) She further affirmed SAPC Geary's overall finding as to his mental functioning, including his ability to understand, remember and carry out detailed, noncomplex instructions. (*Id.* at 99.)

On September 14, 2018, SAPC Jack E. Kundin, M.D., completed a medical evaluation of Plaintiff's medical record.[6] (*Id.* at 109-10.) He noted that the brain magnetic resonance imaging (MRI) did not indicate any focal brain lesions.  (*Id.* at 109.) He also noted the mention of knee arthritis in a record, but "it [wa]sn't severe enough to warrant any films, injections, P.T., or anti-

---

[6] SAPC Kundin noted that Plaintiff's case was referred to the Office of Quality Review (OQR) because Disability Determination Services (DDS) "failed to address the somatic complaints." (doc. 11-1 at 109-10.)

inflammatory drugs." (*Id.*) He concluded that there were "[n]o severe somatic" medical disability impairments. (*Id.* at 109-10.)

On December 20, 2018, Plaintiff underwent a preventative examination by primary care physician, Amy Miller, D.O. (PCP). (*Id.* at 447-55.) Plaintiff's physical and mental status examinations were normal, and his "moderate" activity level and "visual overview of all four extremities [wa]s normal". (*Id.* at 450, 452-54.) PCP diagnosed him with hypertension and hypertriglyceridemia, which were "[c]ontrolled" with prescribed medication, as well as a body mass index of 40-44.9, for which she advised a healthy diet and exercise. (*Id.* at 447.)

On February 8, 2019, Psychologist completed a six-page, check-box and fill-in-the-blank mental medical source statement, noting her weekly visits with Plaintiff since November 2017. (*Id.* at 482-87.) She opined that his anxiety and depression contributed to significant fatigue and low activity level, and that his impairment would last at least 12 months. (*Id.*) Psychologist diagnosed him with PTSD, generalized anxiety disorder, and major depressive disorder, recurrent episode, severe. (*Id.* at 482.) She checked all 22 boxes to indicate the demands of work that Plaintiff found stressful, including speed, deadlines, completing tasks, monotony of routine, remaining at work for a full day, lack of collaboration on the job, underutilization of skills and lack of meaningfulness of work. (*Id.* at 486.) She also checked boxes to show that Plaintiff was unable to meet competitive standards in all eight mental abilities and aptitudes required for semiskilled and skilled work, including an ability to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with work stress, travel in unfamiliar places and use public transportation. (*Id.* at 485.) She made handwritten notes, including that he had undergone a neuropsychological evaluation that showed he had memory problems, executive functioning deficits, difficulty concentrating and

slow processing speed. (*Id.* at 485.) She also noted that that his prognosis was guarded, he was likely to continue to experience hypervigilance, his depression and anxiety contributed "significantly" to his fatigue, he needed reminders to complete basic daily tasks such as grooming and had difficulty remembering one-two step and complex instructions. (*Id.* at 482, 484-85.) Psychologist also checked boxes that he could manage benefits in his own best interest and that his impairments were reasonably consistent with the symptoms and functional limitations described within the same statement. (*Id.* at 486-87.) No clinical, laboratory or diagnostic evidence accompanied the statement.

In a letter dated February 12, 2019, PCP noted that she had treated Plaintiff since 2003, and she had reviewed his medical records concerning the "deteriorating" condition of his knees, back, and hypertension. (*Id.* at 488-89.) She opined that he would qualify for "full medical disability" based on "multiple decompensating medical conditions arising out of his service in the military". (*Id.*) In a similar letter the next day, she extended his time off work until August 2, 2019. (*Id.* at 490.) Neither letter was accompanied by any clinical, laboratory or diagnostic evidence.

Plaintiff attended twelve therapy sessions between February 2019 and June 2019. (*Id.* at 564-75.) Each time, he was medication-compliant, and his mental status remained unchanged. (*Id.*)

In a letter dated March 24, 2019, Plaintiff's wife noted his symptoms arising from his military experience, including fatigue, stomach and digestive issues, dizziness, sleep disorder/nightmares, paranoia, fear, and flashbacks. (*Id.* at 286-87.)

In a post-hearing visit on July 18, 2019, Plaintiff presented to Orthopaedic Specialists of Dallas (Orthopedist) for bilateral knee pain and reported that it had "progressively worsened over the last several years." (*Id.* at 610.) Orthopedist noted "[v]arus deformity", crepitus throughout range of motion but no tenderness, and distal nerve status that was grossly intact. (*Id.* at 611.)

Bilateral knee x-rays revealed advanced degenerative arthritis of both knee joints. (*Id.*) He was diagnosed with bilateral primary osteoarthritis of the knees that would ultimately require total knee arthroplasty. (*Id.*)

## C. Neuropsychological and Neurologic Evaluations

On January 22, 2018, Plaintiff submitted to an evaluation by Andrea Hester, Ph.D. (Neuropsychologist), at Baylor AT&T Memory Center (Baylor). (*Id.* at 317-25.) He was administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV) and obtained a verbal comprehension index of 95, perceptual reasoning index of 86, working memory index of 80, processing speed index of 84, and full-scale IQ of 84. (*Id.* at 319-21.) He demonstrated "grossly intact performances" on tasks of effort and motivation, and his intellectual functioning was "low average and commensurate with a premorbid estimate". (*Id.* at 324.) She opined that "[o]verall, his cognitive profile reflected both frontal subcortical and cortical features (the latter of which was suggested by his performances on naming and work list learning tasks)." (*Id.*) She diagnosed him with a mild cognitive impairment, although she opined that it was unclear to what extent his symptoms were impacted by his childhood history of traumatic brain injury, vascular risk issues, "psychiatric overlay", and hearing impairment. (*Id.*) She made some observations and recommendations for testing and treatment.[7] (*Id.* at 324-25.)

---

[7] These included the following:

1. In light of noted areas of cognitive weakness within his testing profile, as well as psychiatric overlay, such issues will likely impact his ability to resume his former IT job at an expected level of competency at this time.
2. However, following psychiatric stabilization, aspects of cognition could potentially improve, though follow up with a neurologist, with neuroimaging and/or other appropriate diagnostic testing is recommended to assist with determining whether he has a neurodegenerative or other underlying neurological disorder that is contributing to his cognitive presentation.
3. Continued, regular follow-up with a psychiatrist is recommended, and referral options will be discussed with the patient at his follow-up visit.
4. Ongoing individual psychotherapy is also strongly encouraged to address symptoms of anxiety and depression and improve coping and stress management strategies.
5. Variable attention and processing speed could impact his overall efficiency, as well as undermine his ability to

At Baylor on March 8, 2018, Plaintiff complained of memory loss to neurologist Claudia Padilla, M.D. (Neurologist). (*Id.* at 327.) He was alert, oriented times three and had good "history recall". (*Id.*) She referred him to a sleep specialist for obstructive sleep apnea and ordered an MRI of the brain, to which he submitted the next day. (*Id.* at 330-31, 333.) On March 20, 2018, he had been "[s]table" since his last visit, and his MRI results revealed mild anterior temporal and parietal volume loss and mild hippocampal volume loss. (*Id.* at 304-05, 332-33.) Neurologist ordered a fluorodeoxyglucose-positron emission tomography (FDG-PET) of the brain and considered a probable diagnosis of early-onset Alzheimer's disease. (*Id.* at 334.)

On January 23, 2019, Plaintiff reported improved memory and his plans to use the CPAP machine and work out with a trainer. (*Id.* at 590.)

At a second examination with Neuropsychologist on April 24, 2019, Plaintiff endorsed severely elevated symptoms of depression and anxiety. (*Id.* at 594-600.) He reported an ability to perform activities of daily living independently, including driving, although his wife drove most of the time. (*Id.* at 595.) Compared to previous testing, his performances were "relatively stable, including relatively stronger verbal skills when compared to his visuospatial functions (with the exception of borderline impaired naming, which was stable)". (*Id. id.* at 597-99.) Alzheimer's disease did not appear to be a "primary etiological rule-out", as his PET study results were not thought to be consistent with it. (*Id.* at 599.)) Although there were reports of increased functional

---

learn and recall new information. Therefore, it is recommended he allow himself additional time, check himself for errors, and reduce distractions when needing to focus, as well as employ alternative strategies for remembering information, including use of verbal repetition, lists, calendars, notes, and a daily planner.

6.  If needed, a repeat hearing evaluation is suggested, as regular use of hearing aids may be advisable.

7.  Adherence to a self-care routine, which includes regular cardiovascular exercise, a healthy nutritional regimen …, and a consistent sleep schedule is encouraged to help improve overall health and cognitive functioning.

8.  Current neuropsychological test data provide a good baseline from which to compare serial testing as needed to monitor for potential change in cognition….

(*Id.* at 324-25.)

issues (based on test results that suggested areas of improved performance, including in aspects of memory and a challenging executive functioning task), she continued his diagnosis of mild cognitive impairment. (*Id.* at 594-99.) She again made some recommendations.[8] (*Id.* at 600.)

At Baylor on July 3, 2019, Plaintiff was stable and reported that he worked out with a trainer twice a week; he was encouraged to continue physical activity. (*Id.* at 605-09.) At a clinic assessment that day, he reported anxiety and confusion and indicated he needed help to walk. (*Id.* at 602-09.)

**D.  July 17, 2019 Hearing**

On July 17, 2019, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 40-74.) Plaintiff was represented by an attorney. (*Id.*)

*1.  Plaintiff's Testimony*

Plaintiff testified that he lived with his wife in Fink, Texas. (*Id.* at 45.) He was right-handed, 5'9", and weighed 295. (*Id.* at 46.) He had stopped driving a year earlier because he was "confused" and no longer knew how to start the car without instructions from his wife. (*Id.*) He relied on her for transportation, and she had driven him to the hearing that day. (*Id.*)

---

[8] Recommendations from Neuropsychologist's second evaluation included:

1.  Continued, regular follow-up with his psychiatrist is recommended as is ongoing individual psychotherapy to address symptoms of anxiety and depression.
2.  As noted in his 2018 report variable attention and processing speed likely undermines his ability to learn and recall new information. Therefore, it is recommended he allow himself additional time, check himself for errors, and reduce distractions when needing to focus, as well as employ alternative strategies for remembering information, including use of verbal repetition, lists, calendars, notes, emails, and alarms.
3.  Consistent use of his hearing aids recommended, as is use of his CPAP for treatment of obstructive sleep apnea.
4.  Adherence to a self-care routine, which includes regular cardiovascular exercise, adherence to his medical regimen, healthy nutrition (e.g., MIND diet), routine engagement in cognitively stimulating activities, and a consistent sleep schedule is encouraged to help improve overall health and cognitive functioning.
5.  Current and prior neuropsychological test data provide good sources of comparison as needed to monitor for potential change in cognition. I would be happy to follow [Plaintiff] in this regard if clinically indicated and requested by his physician.

(doc. 11-1 at 600.)

After serving in the military and working at GTE Verizon, Plaintiff worked as a senior IT project manager at AT&T until October 2017, when he took sick leave to find out why he suddenly went "blank". (*Id.* at 46-48, 56.) He underwent a memory evaluation to test for Alzheimer's disease and was referred to a neurologist, a psychiatrist, and a psychologist. (*Id.*) Within a month, he found the "right" resources to help him; some issues improved, but "overall" everything remained "flat." (*Id.*) He did not try to find a different job after leaving AT&T. (*Id.* at 48.)

Plaintiff had trouble performing everyday tasks, including eating and dressing. (*Id.* at 50.) He denied doing house chores and could not remember when he last cooked a meal. (*Id.* at 50, 60.) He "mostly" slept and seldom read or watched television. (*Id.* at 50-51.)

Plaintiff did not go anywhere with "any frequency".  (*Id.* at 51.)  Going to medical visits was "hard", and attending the hearing gave him anxiety and an upset stomach. (*Id.*) He had stopped attending church groups and his grandchildren's school events the year before, and he no longer kept in touch with friends, but his son, daughter, and church "acquaintances" visited him. (*Id.* at 51-52, 57.)

Plaintiff denied over-sharing on social medial, using it at all, or knowing how to use a computer. (*Id.* at 52.) His cellphone had no applications; his wife used it to wake him or ask where he was. (*Id.*) He was unable to write a letter or do simple math, like to count change. (*Id.* at 52-53.)

He had been diagnosed with hypertension, and his hearing issues went back at least 10 years.[9] (*Id.* at 49, 59.) The CPAP machine for his sleep apnea was not effective, so he was "always" tired and napped "all the time". (*Id.* at 54-55.) The VA had "ruled against" a PTSD diagnosis he had received after his military service. (*Id.* at 49.) In a letter to the VA, his wife had listed his

---

[9] Plaintiff wore a hearing aid, which was "very helpful." (doc. 11-1 at 49.)

PTSD symptoms, like fear, anxiety, and not trusting anyone. (*Id.* at 53-54.) He had not noticed a difference when taking his PTSD medication, and his doctors considered adjusting it. (*Id.* at 54.)

On cross-examination, Plaintiff testified that he was the "go-to person" at AT&T; he earned a salary of $95,000 with a bonus of 12 percent or more from 2016 to 2017. (*Id.* at 57.) His hobbies included researching, fishing, walking, metal detecting, and taking his grandchildren to the park, but that changed in October 2017, when he began to have work problems. (*Id.* at 56-57, 60.)

Plaintiff testified that it was hard for him to "get up", walk, and bend due to "constant" back, knee, and joint pain. (*Id.* at 59-60.) He needed reminders to shower as well as help to put on his socks and use the television remote control. (*Id.* at 55, 59.) He had "problems with crowds" and "rarely" ate out. (*Id.* at 58.) He had "intrusive thoughts" and "recurring image[s]" of "everything blowing up", like when he was in the military in Germany in the 1980s. (*Id.* at 53, 60-61.) When anxious, he did "rituals," like "tracing" or "repetitively" thinking about the safety of his family or health issues, which "impacted his ability to sleep". (*Id.* at 55-56, 59.)

On examination, Plaintiff stated he had requested an orthopedic referral earlier in the year; he had an appointment with an orthopedic surgeon for his knees the week after the hearing, and the orthopedic surgeon would give him a referral for his back. (*Id.* at 62.)[10]

*2. VE's Testimony*

Plaintiff had past work, as actually and generally performed, as a project manager (DOT 189.117-030, sedentary, SVP-8)[11] and billing supervisor (DOT 214.137-022, sedentary, SVP-8). (*Id.* at 64-65.)

---

[10] At the hearing, the ALJ announced he would hold the record open for 30 days to accept any additional written evidence. (doc. 11-1 at 61-63.)

[11] DOT stands for the Dictionary of Occupational Titles; SVP stands for Specific Vocation Preparation.

The VE considered a first hypothetical individual with Plaintiff's age, education and work experience, with no exertional limitations, who could have occasional contact with the general public (with no customer service or problem-solving tasks) and frequent contact with coworkers and supervisors (but occasional tandem tasks or teamwork); understand, remember and carry out only simple tasks; and adapt to changes and respond with limited judgment and discretion to customary work pressures in a routine work environment (but never at a fast production rate pace like an assembly line). (*Id.* at 65.) The individual could not perform Plaintiff's past work. (*Id.* at 66.) At the medium or higher exertional level, the individual could perform other jobs, including laundry laborer (DOT 361.687-018, medium, SVP-2, reasoning level-1, problem solving level: occasional[12] or less), with 90,000 jobs nationally; industrial cleaner (DOT 381.687-018, medium, SVP-2, reasoning level-2, problem solving level: less than occasional), with 12,000 jobs in the economy; and hospital cleaner (DOT 323.687-010, medium, SVP-2, reasoning level-2, problem solving level: less than occasional), with 41,000[13] jobs in the economy. (*Id.* at 66-67, 71-72.)[14]

On cross-examination, the VE testified that a hospital cleaner's contact with the public would be "minimal to none" because there would be no crowds, and no interaction would be required with any persons he encountered during his "room to room" work. (*Id.* at 68.)

There would be not much tolerance for reducing the production in these "more than occasionally" (but not "necessarily") fast-paced production jobs. (*Id.* at 68-69.) An individual with performance or grooming issues would be given one or two chances to improve. (*Id.* at 69.) An

---

[12] The VE defined "occasional" as up to one-third of the workday. (doc. 11-1 at 71.)

[13] She initially stated that there were 136,000 jobs nationally, but then corrected herself. (doc. 11-1 at 67.)

[14] The VE initially testified that linen room attendant (DOT 222.387-030, medium, SVP-2, reasoning level-3, unskilled) was an available job. (doc. 11-1 at 66.) The ALJ stated that the job should be eliminated because reasoning level-3 jobs were not "compatible" with the "restrictions." (*Id.*)

environment in which an industrial cleaner or a laundry laborer worked "might" be more tolerant about grooming issues than hospitals seeking a "very clean" environment. (*Id.* at 69-70.) An individual engaging in "repetitive rituals" not in the DOT or job description, like ensuring the safety of others, might be given three warnings. (*Id.* at 70-71.) An employer would "maybe" tolerate two absences per month, but only one "unscheduled" absence. (*Id.* at 71.) There would be "little" tolerance for an individual who needed reminders about daily or "routine" tasks (e.g., unloading a washer) because that would take others away from their jobs. (*Id.* at 73.)

### E. **ALJ's Findings**

The ALJ issued a partially favorable decision on September 26, 2019, finding that Plaintiff had not been under a disability prior to July 18, 2019, but he had become disabled on that date and continued to be disabled through the date of his opinion.[15] (*Id.* at 17, 34.) At step one, he found that Plaintiff had met the insured status requirements through December 31, 2021, and he had not engaged in substantial gainful activity since the alleged onset date. (*Id.* at 23-24.)

At step two, the ALJ found that from October 23, 2017 to July 17, 2019, Plaintiff had the severe impairments of cognitive disorder, PTSD, major depressive disorder, and generalized anxiety disorder, and the non-severe impairments of obstructive sleep apnea, hypertension, hypertriglyceridemia and obesity. (*Id.* at 24, 26-27.) At step three, he concluded that these impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (*Id.* at 27.) He specifically stated he considered the paragraph B and paragraph C criteria under Listings 12.02 (neurocognitive disorders), 12.04 (depression, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders),

---

[15] As noted, Plaintiff alleged disability beginning on October 23, 2017. (doc. 20 at 7.)

and 12.15 (trauma- and stressor-related disorders). (*Id.* at 27-28.) None were satisfied. (*Id.* at 28.)

Next, the ALJ determined that before the established onset date, Plaintiff retained the RFC to perform a "full range of work at all exertional levels" with the following "nonexertional" limitations: he could adapt to changes, respond to customary work pressures in a routine environment with limited judgment and discretion, and understand, remember and carry out simple tasks; he could have occasional contact with the general public (but no customer service or problem solving tasks) and frequent contact with coworkers and supervisors (but occasional tandem tasks or teamwork); and he should not work at a "fast production-rate pace" like an assembly line. (*Id.* at 28-29.) At step four, he determined that Plaintiff was unable to perform his past work. (*Id.* at 32.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that he was not disabled regardless of whether he had transferable job skills, but considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id.* at 32-33.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, prior to July 18, 2019. (*Id.* at 34.)

The ALJ next found that beginning July 18, 2019,[16] Plaintiff had the following severe impairments: knee impairment, obesity, cognitive disorder, PTSD, major depressive disorder, and generalized anxiety disorder. (*Id.* at 24.) Nevertheless, he determined that Plaintiff had no impairment or combination of impairments that met or medically equaled any medical listing. (*Id.*

---

[16] The ALJ's decision stated that "[b]eginning on the established onset date of disability, July 18, *2019*, [Plaintiff] has had the following severe impairments: knee impairment and obesity as of July 18, *2018*; cognitive disorder, major depressive disorder, generalized anxiety disorder, and PTSD." (doc. 11-1 at 24) (emphasis added). The Commissioner contends that this discrepancy in years is a "scrivener's error" because all other references to the established onset date were to 2019. (doc. 25 at 9 n.5 (citing doc. 11-1 at 28, 30-32).) Plaintiff did not dispute this contention. (*See* doc. 20.)

at 27.) Next, the ALJ found that beginning July 18, 2019, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except he could stand and/or walk 4 hours in an 8-hour workday. (*Id.* at 31.) At step four, he found that Plaintiff was unable to perform his past work. (*Id.* at 32.) At step five, the ALJ determined that Plaintiff had no transferable skills; beginning July 18, 2019, there were no jobs that existed in significant numbers in the national economy that Plaintiff could perform, considering his age, education, work experience, and RFC. (*Id.* at 32-34.) Accordingly, Plaintiff had not been under a disability prior to July 18, 2019, but he became disabled, as defined by the Social Security Act, on that date and through the date of his decision. (*Id.* at 34.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff presents the following as issues:

1.  The Commissioner did not rely on substantial evidence in [his] partially favorable decision where objective evidence regarding mental and cognitive health deficits are ignored and impermissibly weighed (as seen in severity; listing and evidence; and residual functional capacity analysis).

2.  Substantial evidence does not exist and [P]laintiff is prejudiced where proper findings of fact and recitation of the evidence which supports each finding are absent.

(doc. 20 at 5.)

### A.  **Severe Impairments**[17]

Plaintiff first argues that the ALJ "incorrect[ly]" found that his osteoarthritis and knee and back impairments were not severe impairments, or even medically determinable impairments,

---

[17] Because Plaintiff briefs the subparts of his first issue separately, they are discussed separately. (doc. 25.)

"prior to the established onset date". (doc. 20 at 12 (citing doc. 11-1 at 27.)) Commissioner responds that the ALJ properly determined his severe impairments. (doc. 25 at 8.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii),(c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Social Security Regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with [his] ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985). Accordingly, to meet the severity threshold at step two, "the claimant need only ... make a *de minimis* showing that [the] impairment is severe enough to interfere with h[is] ability to do work." *Anthony*, 954 F.2d at 294 n.5 (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). As noted, the claimant has the burden to establish that his impairments are severe. *See Bowen v. Yukert*, 482 137, 146 n.5 (1987).

Here, the ALJ found that from October 23, 2017 through July 17, 2019, Plaintiff had the severe impairments of cognitive disorder, PTSD, major depressive disorder, and generalized anxiety disorder, and the non-severe impairments of obstructive sleep apnea, hypertension,

hypertriglyceridemia and obesity.[18] (doc. 11-1 at 24, 26-27.) He found that as of July 18, 2019, Plaintiff had the severe impairments of knee impairment, obesity, cognitive disorder, major depressive disorder, generalized anxiety disorder and PTSD. (*Id.* at 24.) He specifically noted that osteoarthritis and knee and back impairments were not medically determinable impairments, much less severe impairments, before the established onset date. (*Id.* at 27.) He considered some treatment records indicating that Plaintiff had diagnostics and "some remote" treatment for back and knee pain, but not during the relevant period. (*Id.* (citing *id.* at 390, 442-55).) He further noted that Plaintiff had not alleged back or knee pain as a basis for disability in his initial disability report or upon reconsideration; on his function report, he checked a box indicating he had difficulty bending but did not explain or check any other physical limitations. (*Id.* at 27, 32 (citing *id.* at 77, 90, 235-42).) Finally, the ALJ considered that Plaintiff had received an orthopedic referral from PCP, and he had a post-hearing appointment for his knees and back. (*Id.* at 27; *see also id.* at 62.) Earlier in his decision, the ALJ had noted Plaintiff's post-hearing diagnosis of bilateral primary osteoarthritis of the knees. (*Id.* at 26 (citing *id.* at 611).)

The ALJ concluded that the "available objective medical evidence of record for the relevant period fail[ed] to provide a diagnosis, treatment, or any other assessment or impression establishing or confirming any residual impacts from osteoarthritis and knee and back impairment." (*Id.* at 27.) He found that Plaintiff had "not connected" any limitations to the alleged osteoarthritis and knee and back impairment before the established onset date, and that even if such impairments were medically determinable, they did not impose any limitations upon his abilities to perform basic work activities during the relevant period. (*Id.*)

---

[18] Plaintiff does not contend that the ALJ applied an incorrect standard for evaluating a severe impairment under *Stone*, 752 F.2d 1099. (*See* doc. 20 at 11-14).

Plaintiff points to knee x-rays in 2013 and 2015, Sleep Doctor's May 2018 treatment note, PCP's February 2019 letter, Neuropsychologist's April 2019 consultative examination, and his post-hearing diagnosis of bilateral knee degenerative arthritis in July 2019, to support his argument. (doc. 20 at 12-13.) The ALJ did note "*remote treatment*" for back and knee pain and a "*post*-hearing" orthopedic appointment for Plaintiff's knee and back, but he expressly found that this evidence fell outside the relevant period. (doc. 11-1 at 27) (emphasis added). None of Plaintiff's 2013 or 2015 medical records related to the relevant period. *See Cauthen v. Comm'r of Soc. Sec.*, 415 F. Supp. 3d 738, 744 (N.D. Miss. 2019) (holding that "none of claimant's pre-application medical records relate to whether she was disabled *during the relevant period*"), *aff'd sub nom. Cauthen v. Saul*, 827 F. App'x 444 (5th Cir. 2020). The medical records from Sleep Doctor, PCP and Neuropsychologist contained at most only an assessment or diagnosis, and they failed to address functionality. *See id.*

Plaintiff has not shown that his osteoarthritis and knee or back pain were severe impairments before the established onset date of July 18, 2019, and substantial medical evidence instead supports the ALJ's findings that these limitations did not result in more than minimal limitations in his ability to perform work-related activities before July 18, 2019. *See*, *e.g., id.*; *Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also Ware v. Kijakazi*, No. CV H-20-1275, 2022 WL 347618, at *5 (S.D. Tex. Jan. 19, 2022) (rejecting plaintiff's argument as to the alleged severity of her back impairment and noting that "at most" her testimony indicates she experienced pain prior to the onset date) (citing 20 C.F.R.

§ 404.1520(c)), *report and recommendation adopted*, No. CV H-20-1275, 2022 WL 345649 (S.D. Tex. Feb. 3, 2022). The ALJ did not err by finding that Plaintiff's osteoarthritis and back and knee impairments were not medically determinable impairments before the established onset date. Remand is not required on this basis.[19]

## B. Onset Date

Plaintiff argues that "the degenerative condition of osteoarthritis of the knees is neither viewed under SSR 18-1p[,] 2018 WL 4945639, properly identified in the historical record, or analyzed with the testimony of record indicating the request for treatment in the last year, [which] is error", and that the ALJ's onset date is "arbitrary". (doc. 20 at 12.) Without addressing SSR 18-01p, the Commissioner interprets this argument as "an allegation that he had a severe knee impairment prior to July 18, 2019 and was therefore disabled as of his alleged disability onset date,

---

[19] Plaintiff mentions that "sleep apnea and hypertension, in his situation, are both medically determinable and severe conditions" and that they contributed to his "cognitive decline." (*See* doc. 20 at 13 n.1, 14.) He did not list this claim as an issue for review or separately brief it. (*See id.*) Even if he had properly raised it, the ALJ specifically noted the "relatively infrequent trips to the doctor for allegedly disabling somatic complaints," with the exception of sleep apnea. (doc. 11-1 at 30.) For Plaintiff's sleep apnea, the medical records showed that he had been assessed with obstructive sleep apnea in April 2018, had been prescribed a CPAP machine, was compliant in using it, and reported he was sleeping better in May 2018. (*Id.* at 386, 389-91.) The ALJ specifically noted that the Sleep Doctor found that the CPAP had been helpful to him, particularly after an adjustment, and that he was "doing much better" and "not as sleepy" in July 2018. (*Id.* at 25, 30 (citing *id.* at 383-84.)) The ALJ did not err in finding sleep apnea or hypertension to be non-severe impairments. *See Easom v. Colvin*, No. 3:12-CV-1289-N-BN, 2013 WL 2458540, at *6 (N.D. Tex. June 7, 2013) (finding "the mere mention of an impairment in the medical record" is insufficient to establish a severity finding that plaintiff's hypertension is severe) (citation omitted); *Franklin v. Astrue*, No. CIVASA07-CV-0148OG(NN), 2008 WL 577217, at *6 (W.D. Tex. Feb. 6, 2008) (finding that plaintiff's sleep apnea was non-severe because plaintiff had obtained a CPAP machine, had used it "faithfully", had denied daytime sleepiness and two physicians had noted that his sleep apnea was well-controlled); *see also Henson v. Comm'r of Soc. Sec.*, No. 3:20-CV-201-DAS, 2021 WL 3074169, at *1 (N.D. Miss. July 20, 2021) (finding plaintiff did not show that his sleep apnea was severe because the ALJ acknowledged his diagnosis of sleep apnea, the record showed he had been prescribed and obtained a CPAP machine, and plaintiff admitted that it helped his symptoms when he used it). Even if the ALJ erred in failing to find his sleep apnea and hypertension to be severe impairments, the error was harmless because he proceeded beyond step two. *See Herrera*, 406 F. App'x at 903 (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *see also Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL 1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain why he found only certain impairments to be severe, the error was harmless where he proceeded with the sequential evaluation process).

October 23, 2017." (doc. 25 at 9.)[20]

    *1. SSR 18-01p*

    SSR 18-01p, which rescinded and replaced SSR 83-20, except as noted, explains how the established onset date (EOD) of new applications filed (or claims pending) on and after the "applicable date" of October 2, 2018, is determined. 2018 WL 4945639, at *7 (Oct. 2, 2018) (citing SSR 83-20, 1983 WL 31249 (S.S.A. 1983)). The EOD is the "earliest date" during the period covered by the claimant's application[21] that he meets both the applicable non-medical requirements under the Social Security Act[22] and the statutory definition of disability. *Id.* at *2, 5. As noted, to meet the disability definition, the claimant must show[23]:

> [T]hat he … is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

*Id.* at *3-4 n.5 (citing 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a)). The ALJ considers "all of the evidence of record." *Id.* at *5.[24] If the evidence supports a finding that the claimant met the disability definition during the application period, the ALJ will

---

    [20] As noted, the ALJ found that Plaintiff's knee impairment was not severe before the established onset date, but it became severe on that date through the date of his decision. (doc. 11-1 at 24.)

    [21] This is the period "when a claimant may be entitled to benefits" under Titles II or XVI of the Social Security Act based on the type of claim and facts of the case in a particular application. SSR 18-01p, 2018 WL 4945639, at *3, 5.

    [22] These requirements depend on the type of claim. SSR 18-01p, 2018 WL 4945639, at *4. A claimant with a DIB claim must show that: (1) He met the disability definition before his insured status expired, and (2) He currently meets the disability definition, or his disability ended within the 12-month period before the month that he applied for benefits. *Id.* at *4-5 (citing 20 C.F.R. §§ 404.315, 404.316, 404.320, 404.321 as "some" of the regulations explaining the DIB non-medical requirements)

    [23] The claimant must provide evidence to prove when he first met the disability definition. 2018 WL 4945639, at *4.

    [24] If the ALJ determines that the claimant is not under a disability, the ALJ "shall" consider all evidence available in a claimant's file and "shall" develop a complete medical history of at least the preceding 12 months. *See* 2018 WL 4945639, at *4 (quoting 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i)).

then consider the "earliest date" that the claimant met the disability definition. *Id.* at *3-7.

To determine the earliest date (or onset date), the ALJ first considers the potential onset date, which is the first date that the claimant met the non-medical requirements during the application period. *Id.* at *3. SSR 18-01p expressly provides that the ALJ may "reasonably infer" the onset date, but it "must be supported by the medical and other evidence and be consistent with the nature of the impairment(s)." *Id.* at *5.[25] The ALJ "tak[es] into account" the claimant's alleged onset date but further consider sthe nature of the impairment claimed: traumatic[26], non-traumatic or "exacerbating and remitting". *Id.* at *1, 3. To infer the onset date where the claimant has a nontraumatic[27] or "exacerbating and remitting"[28] impairment, the ALJ considers:

> the nature of the claimant's impairment; the severity of the signs, symptoms, and laboratory findings; the [claimant's] longitudinal history and treatment course (or lack thereof); the length of the impairment's exacerbations and remissions, if applicable; and any statement by the claimant about new or worsening signs, symptoms, and laboratory findings.

*Id.* at *5-6.[29]

If the onset date cannot be "reasonably infer[red]" from the record, the ALJ has three

---

[25] The inferred onset date "may predate the claimant's earliest recorded medical examination or the date of the claimant's earliest medical records." SSR 18-01p, 2018 WL 4945639, at *6.

[26] Traumatic impairments are those "that result from a traumatic injury or other traumatic event". SSR 18-01p, 2018 WL 4945639, at *5. If the ALJ finds that evidence shows that a claimant with a traumatic impairment met the disability definition on the date of the traumatic event or traumatic injury, he will use that date as the onset date. *Id.* at *5-6.

[27] Non-traumatic impairments include those expected to improve (such as pathologic bone fractures caused by osteoporosis), worsen (such as muscular dystrophy), or stay the same (such as an intellectual disability). SSR 18-01p, 2018 WL 4945639, at *5.

[28] Exacerbating and remitting impairments are those that diminish and intensify in severity over time. SSR 18-01p, 2018 WL 4945639, at *5.

[29] To determine the onset date of a claimant with both a traumatic impairment and a non-traumatic or exacerbating and remitting impairment, the ALJ will consider all of the impairments "in combination"—e.g., the date of the traumatic event as well as the evidence pertaining to the other impairment—to determine the date on which the "combined impairments first caused the claimant to meet the [disability] definition." SSR 18-01p, 2018 WL 4945639, at *7.

options. *See id.* at *6. If the record "suggests that additional medical evidence relevant to the period … is available", the ALJ "*will* help develop the record" and "*may* request existing evidence" from the "medical source". *Id.* (emphasis added). Absent additional medical evidence, the ALJ *may* consider evidence from "other non-medical sources", such as the claimant's family, friends, or former employers. *Id.* (emphasis added). Finally, the ALJ "*may*, but is not required to," seek medical expertise through testimony or written interrogatories. *Id.* at *1, 6 (emphasis added). SSR 18-01p expressly provides that:

> The decision to call on the services of an ME is *always* at the ALJ's discretion. Neither the claimant nor his or her representative can require an ALJ to call on the services of a[] [medical expert] to assist in inferring the date that the claimant first met the statutory definition of disability.

*Id.* at *6 (emphasis added).[30]

Although neither the ALJ nor the Commissioner mentioned SSR 18-01p, it applies because Plaintiff's claims were pending after its applicable date. *See* 2018 WL 4945639, at *7 ("expect[ing]" federal courts to review SSA decisions using the rulings "in effect" at the time they were issued); *see also Velazquez v. Kijakazi*, No. 2:20-CV-342-JPK, 2022 WL 970068, at *7-8 (N.D. Ind. Mar. 30, 2022) (applying SSR 18-01p even though the Commissioner did not mention it in her response brief and the ALJ did not mention it in his decision).[31]

*2. Requisite Analysis*

Here, the ALJ determined that between October 23, 2017 and July 17, 2019, Plaintiff had the RFC to perform a full range of work at all exertional levels with the following "nonexertional" limitations: he could adapt to changes, respond to customary work pressures in a routine

---

[30] "The Fifth Circuit has not yet construed SSR 18-01p." *See Ray L. v. Kijakazi*, No. 4:19-CV-4362, 2021 WL 3742023, at *5 (S.D. Tex. Aug. 24, 2021).

[31] Plaintiff does not argue that the ALJ did not properly consider his alleged onset date. (*See* doc. 20 at 12-14.) As noted, he instead appears to argue that his knee impairment was severe "*prior to* the established onset date" of July 18, 2019." (*Id.* at 12) (emphasis added).

26

environment with limited judgment and discretion, and understand, remember and carry out simple tasks; and he could have occasional contact with the general public (with no customer service or problem solving tasks) and frequent contact with coworkers and supervisors (with no more than occasional tandem tasks or teamwork), but he should not work at a "fast production-rate pace", like an assembly line. (doc. 11-1 at 28-29.) He began by considering Plaintiff's various diagnoses of generalized anxiety disorder, major depressive disorder, PTSD, mild cognitive impairment, hypertension, and obstructive sleep apnea. (*Id.* at 24-26, 30-31 (citing *id.* at 250, 302, 349-53, 387.)) The ALJ found that Plaintiff's alleged disabling mental and physical symptoms—e.g., poor sleep, difficulty dressing, not going anywhere or keeping in touch with anyone—were inconsistent with the medical evidence and his function report, which showed that he had "significantly more modest" deficits than those alleged by him or his treating source opinion statements. (*Id.* at 30 (citing *id.* at 50-52, 58, 344, 364, 447, 482-88.)) For example, the evidence showed he sometimes drove and went shopping, he was compliant with his medication and CPAP machine, he reported feeling better with adjustments to his medication and machine, and his mental and physical examinations were within normal limits. (*Id.* (citing *id.* at 265, 268, 378, 383-84, 386, 447-55, 578-82.)) The ALJ also pointed out that knee pain did not "figure prominently in the treatment records" until later in the period, and that the record instead showed that he engaged in moderate activity, took two trips out of state, and worked out with a trainer twice a week in July 2019. (*Id.* at 30-32 (citing *id.* at 442, 450-54, 576, 590, 606.))

The ALJ then determined that beginning July 18, 2019, through the date of his decision, Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except he could stand and/or walk 4 hours in an 8-hour workday.[32] (*Id.* at 31.) In reaching this conclusion, he

---

[32] Under the regulations, "light work" involves, in part "lifting no more than 20 pounds at a time with

expressly found that beginning July 18, 2019, Plaintiff's allegations regarding his symptoms and limitations, as well as his statements concerning the intensity, persistence and limiting effects of these symptoms, were consistent with the medical evidence and other evidence. (*Id.* at 32.) He based his finding on Plaintiff's post-hearing orthopedic visit on July 18, 2019, in which he had knee pain (but no tenderness), was assessed with advanced degenerative arthritis, was diagnosed with bilateral primary osteoarthritis of knee, and was advised that he would eventually require total knee arthroplasty bilaterally. (*Id.* (citing *id.* at 610-11.)) Considering Plaintiff's diagnosis of bilateral primary osteoarthritis of knee and noting PCP's letter, which referenced his knee pain, he established the onset date on the diagnosis date, although he expressly noted that "it is likely that [his] knee impairment was a gradually degenerative condition". (*Id.* (citing *id.* at 610-11.)) The ALJ found that, prior to the onset date, any of Plaintiff's knee-related symptoms were "relatively minor" and that Plaintiff "sought and obtained a referral when it became more limiting". (*Id.*)

Although he did not specifically reference SSR 18-01p, the ALJ's decision "shows [that] he properly applied the requisite analysis." *See Velazquez*, 2022 WL 970068, at *8 (citation omitted). First, he developed a complete medical history of Plaintiff's impairments and pointed to prior treatment and imaging outside the relevant period, to administrative filings that failed to raise any physical limitation as a basis for disability, and to the absence of complaints until later in the period. *Ray L.*, 2021 WL 3742023, at *5 ("To 'determine whether a claimant meets the statutory definition of a disability,' the Commissioner 'shall consider all evidence available in [an] individual's case record, and shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a

---

frequent lifting or carrying of objects weighing up to 10 pounds …. [A] job … in this category … requires a good deal of walking or standing." *See* 20 C.F.R. § 404.1567(b).

disability.'") (citing SSR 18-01p, 2018 WL 4945639, at *4). He specifically noted Plaintiff's prior treatment, his reported ability to function independently despite some physical limitations, and his out-of-state travel in Spring 2018, normal physical examinations and moderate physical activity in December 2019, and bi-weekly workouts with a personal trainer in July 2019. *See Madrid v. Comm'r of Soc. Sec.*, No. 1:20-CV-01006-SAB, 2022 WL 432858, at *17 (E.D. Cal. Feb. 11, 2022) ("This is not a case where the ALJ's determination of the EOD was not supported by analysis and reliance on specific medical evidence in the record."); 2018 WL 4945639, at *5-6 ("We review the relevant evidence and consider, for example … the severity of the signs, symptoms, and laboratory findings; the longitudinal history and treatment course (or lack thereof); the length of the impairment's exacerbations and remissions, if applicable; and any statement by the claimant about new or worsening signs, symptoms, and laboratory findings."). The ALJ identified a gap in the evidence to support Plaintiff's alleged knee impairment and permitted him 30 days after the hearing to submit any additional written evidence. *See* SSR 18-01p, 2018 WL 2018 WL 4945639, at *6 ("If … information in the … file … suggests that additional medical evidence relevant to the period … is available, [the ALJ] *will* assist with developing the record….") (emphasis added); (doc. 11-1 at 61-63, 73-74). When Plaintiff presented evidence of Orthopedist's assessment of advanced degenerative arthritis of both knee joints and his opinion that Plaintiff would ultimately require total knee arthroplasty bilaterally, the ALJ expressly noted that "it is likely that [his] knee impairment was a gradually degenerative condition". *See Ray L.*, 2021 WL 3742023, at *5 ("The ALJ also recognized that Plaintiff suffered from an illness that declined over time."); 2018 WL 4945639, at *5-6 ("We review the relevant evidence and consider, for example, the nature of the claimant's impairment."). Having obtained objective medical evidence to support the onset date of Plaintiff's knee impairment, the ALJ found that beginning July 18, 2019, Plaintiff's allegations

regarding his symptoms and limitations were consistent with the evidence. (*Id.* at 32.) Because he based his decision on the medical and other evidence and specifically noted the degenerative condition of Plaintiff's knee impairment, the ALJ reasonably inferred the onset date in accordance with SSR 18-01p. *See* 2018 WL 2018 WL 4945639, at *5; *see also Ray L.*, 2021 WL 3742023, at *5-6 (finding the ALJ properly determined the EOD of a progressive impairment because he "accounted for … the declining course of Plaintiff's cognitive impairment after his stroke" and "considered the hearing testimony and the available medical evidence"); *Madrid*, 2022 WL 432858, at *12 n.7, 17 ("taking the entirety of the ALJ's opinion and analysis of the evidence of record in determining the EOD [of claimant's progressive impairments], the determination was supported by substantial evidence").

Although the medical evidence showed that Plaintiff suffered from several impairments during the application period, substantial evidence supports the ALJ's conclusion that the nature of Plaintiff's progressive knee impairment did not become sufficiently severe as to prevent him from working until July 18, 2019. *See Velazquez*, 2022 WL 970068, at *8 (holding that the ALJ's failure to mention the new regulation was "not dispositive" if the decision otherwise showed he "properly applied the requisite analysis"); *Ray L.*, 2021 WL 3742023, at *6 (affirming the Commissioner's decision because the ALJ applied the standard articulated in SSR 18-01p). Remand is not required on this basis.

## C. **Listed Impairments**

Plaintiff does not contend that he meets the requirements for any particular Listing; he instead "requests a critical examination of substantial evidence" of the ALJ's finding that his limitations are not "supported by cognitive testing or other objective medical evidence of record" and that he "demonstrated *no significant cognitive decline* in July of 2019". (doc. 20 at 14.) The

Commissioner responds that Plaintiff's argument fails because he "failed to assert which Listing he believes he satisfied", and the ALJ "properly evaluated Plaintiff's impairments at step three of the sequential evaluation process". (doc. 25 at 10.)

The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses ... most of which are categorized by the body system they affect." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530. The claimant bears the burden of proving that his impairments meet or equal the criteria found within the Listings. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990); *Henson v. Barnhart*, 373 F.Supp.2d 674, 685 (E.D. Tex. 2005) (citing *McCuller v. Barnhart*, 72 F. App'x 155, 158 (5th Cir. 2003)). "For a claimant to show that his impairment matches a Listing, it must meet *all* of the specified medical criteria." *Sullivan*, 493 U.S. at 530 (emphasis in original). The criteria in the Listings are designed to be "demanding and stringent," *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994), because the Listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary", *Zebley*, 493 U.S. at 532. If a claimant fails to meet his burden, the ALJ's finding is supported by substantial evidence. *Henson*, 373 F. Supp. at 685 (citing *Selders*, 914 F.2d at 620).

The decision of whether a claimant meets or equals a Listing is ultimately reserved to the Commissioner. *Malone v. Colvin*, No. H-13-3043, 2015 WL 1291824, *14 (S.D. Tex. Mar. 16, 2015) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); SSR 96-5p, 1996 WL 374183, at *2-3, 5 (S.S.A. 1996); SSR 96-6p, 1996 WL 374180, at *3-4 (S.S.A. July 2, 1996). The ALJ should, however, identify the listed impairment and explain how he determined that the symptoms were insufficiently severe to meet it. *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007).

As noted, Plaintiff did not identify a single Listing that his impairments allegedly meet or

equal, list the criteria for any Listing, explain how his impairments meet or equal any criteria of any Listing, or cite to any evidence in the record relevant to any Listing. (*See* doc. 20.) The cursory references to a Listing in his brief are in the table of contents, the issues section, the description of the ALJ's decision, or the subheading of the discussion of the issues. (*See id.* at 2, 5, 10, 14.) He therefore fails to satisfy his burden of proving that he meets the Listing criteria. *See Phyllis R. v. Berryhill*, No. 3:18-CV-478-D-BT, 2019 WL 1367684, at *4 (N.D. Tex. Mar. 8, 2019), *report and recommendation adopted*, No. 3:18-CV-0478-D, 2019 WL 1358903 (N.D. Tex. Mar. 26, 2019), *aff'd sub nom. Russo v. Saul*, 805 F. App'x 269 (5th Cir. 2020) ("In fact, [plaintiff] does not identify a single listing to which her combination of impairments is allegedly equivalent. Thus, she has not met her burden.").

At most, Plaintiff appears to allege that he meets a Listing related to "cognitive decline" based on "cognitive testing or other objective medical evidence of record", (*see* doc. 20 at 14). A solitary reference to an alleged impairment based on unspecified testing and "other" evidence is insufficient to meet his burden, however. *See Parker v. Colvin*, No. CV 14-177-SCR, 2015 WL 6566008, at *4 (M.D. La. Oct. 30, 2015) (finding that plaintiff did not meet his burden to prove he has an impairment that matches a particular listing because "[he] did not identify any specific listing" under which he believed he should have been found disabled, "nor did he cite what evidence in the record established he satisfied the criteria of a listing"); *see also Aymond v. Comm'r of Soc. Sec. Admin.*, No. 6:21-CV-01161, 2022 WL 486285, at *7 (W.D. La. Feb. 1, 2022), *report and recommendation adopted sub nom. Aymond v. US Comm'r of Soc. Sec.*, No. 6:21-CV-01161, 2022 WL 479528 (W.D. La. Feb. 16, 2022) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Villarreal v. Comm'r of Soc. Sec.*

*Admin.*, No. EP-17-CV-00288-ATB, 2018 WL 1833002, at *4 (W.D. Tex. Apr. 16, 2018) (finding that plaintiff's argument is waived because she "fail[ed] to argue how she satisfie[d] each element of Listing 1.02") (citation omitted); *Chiles v. Colvin*, No. 3:12-CV-3516-L-BH, 2014 WL 630888, at *11 (N.D. Tex. Feb. 18, 2014) (holding that because the plaintiff failed to meet his step three burden to provide documentation of the manifestations of his HIV infection during the relevant period, he failed to show that his HIV infection met Listing 14.08).

Moreover, although Plaintiff requests that the court provide a "critical" review of the ALJ's findings, he carries the burden at this step to prove that his impairments meet or equal the criteria found within the Listings. *See Selders*, 914 F.2d at 619; *Chiles v. Colvin*, No. 3:12-CV-3516-L-BH, 2014 WL 630888, at *11. He failed to meet his burden to show that the ALJ's finding is not supported by substantial evidence. *Henson*, 373 F. Supp. at 685 (citing *Selders*, 914 F.2d at 620); *see also Phyllis R.*, 2019 WL 1367684, at *4 (finding plaintiff failed to establish that ALJ's decision was not supported by substantial evidence by not identifying a specific listing, proving she met or equaled the criteria for a specific listing, or identifying any evidence supporting her contention). Remand is not required on this basis.

## D.  Medical Opinion Evidence[33]

Plaintiff argues that under the new 2017 regulations, the opinions of Psychologist and Neuropsychologist are "objective medical evidence" and are "not [to be] weighed as 'persuasive' or 'unpersuasive'", and that by doing so, the ALJ committed reversible error. (doc. 20 at 15.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. Every medical opinion is

---

[33] Although Plaintiff does not list this issue, he briefs it within the section titled "Listing and evidence analysis". (*See* doc. 20 at 14-17.)

evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). A medical opinion is a statement from a medical source about what the claimant can still do despite his impairments and whether he has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. *Id.* §§ 404.1513(a)(2), 416.913(a)(2).

The guidelines provide that the ALJ will explain in his determination or decision how persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b)(2), 416.920c(b). "The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted). Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a). Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support his own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See id.*

34

§§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ must explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). He may, but is not required to, explain how he considered the remaining factors. *Id.*

When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. *Id.* §§ 404.1520c(b)(1), 416.920c(b)(1). The ALJ evaluates the persuasiveness of the opinions when determining disability, and the sole responsibility for a disability determination rests with him. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

### 1. *Psychologist's Opinions*

Here, Psychologist met Plaintiff in person for weekly individual therapy sessions from November 2017 until at least May 2018. (doc. 11-1 at 24 (citing 416-41, 564-75).) At his evaluation in November 2017, Plaintiff was alert and fully oriented, his mood and affect were depressed, sad and anxious. (*Id.* (citing *id.* at 437-41.)) Plaintiff reported anxiety and "memory difficulties" due to work stressors and his military experience. (*Id.* (citing *id.* at 432-36.)) In May and June 2018, Plaintiff had concentration deficits, needed to be reminded to bathe and groom, and reported hypervigilance and "no changes" in his mental status. (*Id.* (citing *id.* at 416-419.)) He was first diagnosed with generalized anxiety disorder, major depressive disorder and PTSD in November 2017, and his diagnoses were continued until February 2019. (*Id.* at 25 (citing *id.* at 415, 437-41, 482-87.))

The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are "brief and conclusory" and "lack 'explanatory notes' or 'supporting objective tests and examinations.'" *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (citing *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)). District courts in this circuit have found that under the new regulations, brief and conclusory opinions unsupported by relevant medical evidence lack supportability. *See*, *e.g., Bruen v. Kijakazi*, No. 1:20-CV-278 LGI, 2022 WL 452411, at *3 (S.D. Miss. Feb. 14, 2022) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best .... [but when] these so-called reports 'are unaccompanied by thorough written reports, their reliability is suspect.'") (citation omitted); *Benson v. Saul*, No. 3:20-CV-1974-E-BH, 2022 WL 868706, at *16 (N.D. Tex. Mar. 8, 2022), *report and recommendation adopted*, No. 3:20-CV-1974-E-BH, 2022 WL 865886 (N.D. Tex. Mar. 23, 2022) (finding that the lack of persuasiveness of the check-box form goes to its lack of supportability); *Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860 *8 (N.D. Tex. Dec. 4, 2020) (illustrating how less persuasive a "brief and conclusory" check-box questionnaire stands in comparison to a narrative statement, which contains substantive explanation) (citing *Heck*, 674 F. App'x at 415, and *Foster*, 410 F. App'x at 833)).

Here, the ALJ considered Psychologist's letters. (doc. 11-1 at 24-25.) Her three-sentence, January 9, 2018 letter stated that Plaintiff could not function effectively in a work environment because of "significant anxiety" and a reported "significant decline" in his cognitive functioning, including trouble with memory and completing tasks. (*Id.* at 25 (citing *id.* at 364.)) Her four-sentence January 25, 2018 letter reflected her diagnosis of generalized anxiety disorder, defined his symptoms as severe, and assigned him a GAF score of 42. (*Id.* (citing *id.* at 302.)) Her half-page June 2018 letter stated that Plaintiff had severe concentration deficits and warranted a PTSD

diagnosis based on intrusive memories, flashbacks and nightmares relating to his traumatic military experiences in Germany. (*Id.* (citing *id.* at 415.)) She listed other symptoms, including severe sleep disturbance, persistent anxiety and distress, memory deficits, self-doubt, irritability, hypervigilance, and diminished interest in activities. (*Id.* at 415.) No clinical, laboratory or diagnostic evidence accompanied her letters.

The ALJ also considered Psychologist's medical source statement, a six-page check-box and fill-in-the-blank form, and her opinion that Plaintiff's anxiety and depression contributed to significant fatigue and low activity level and that his impairment would last at least 12 months. (*Id.* at 482-87.) She checked all 22 boxes to indicate the demands of work that Plaintiff found stressful, including speed, deadlines, completing tasks, monotony of routine, remaining at work for a full day, lack of collaboration on the job, underutilization of skills and lack of meaningfulness of work. (*Id.* at 486.) Notably, she checked boxes to show that Plaintiff was unable to meet competitive standards in all eight mental abilities and aptitudes required for semiskilled and skilled work, including an ability to understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with work stress, travel in unfamiliar places, and use public transportation. (*Id.* at 485.) Psychologist also checked boxes to show that he could manage benefits in his own best interest and that his impairments were reasonably consistent with the symptoms and functional limitations described within the same statement. (*Id.* at 486-87.) She noted that he had undergone a neuropsychological evaluation, which revealed memory problems, executive functioning deficits, difficulty concentrating and slow processing speed. (*Id.* at 485.) She also noted that that his prognosis was guarded, he was likely to continue to experience hypervigilance, his depression and anxiety contributed "significantly" to his fatigue, he needed reminders to complete basic daily tasks such as grooming,

and he had difficulty remembering one-two step and complex instructions. (*Id.* at 482, 484-85.) Psychologist also checked boxes to show that he could manage benefits in his own best interest and that his impairments were reasonably consistent with the symptoms and functional limitations described within the same statement. (*Id.* at 486-87.) No clinical, laboratory or diagnostic evidence accompanied the statement.

      The ALJ specifically found that Psychologist's opinions were "inconsistent with and unsupported by the objective evidence, which reveal[ed] significantly greater functionality, as documented [earlier in his decision]." (*Id.* at 31 (citing *id.* at 302, 364, 415.)) He pointed to evidence that despite her opinions as to his limitations, Plaintiff was able to accurately relate his medical history appropriately to treatment providers, shopped in stores, napped during the day, did things around the house, and tried to stay busy. (*Id.* at 28 (citing *id.* at 265-75.)) The ALJ also pointed to Neuropsychologist's assessments, which Psychologist referenced in her medical source statement, and which found that Plaintiff had cognitive deficits that were "significantly more modest than those alleged or indicated" by Psychologist's opinions. (*Id.* at 30 (citing *id.* at 317-25.)) He also noted that while there was some indication that Plaintiff had been diagnosed with early onset Alzheimer's disease based on an MRI, it was not clear whether there was any confirmation of that diagnosis. (*Id.*; *compare id.* at 332, *with id.* at 599.)

      Because Psychologist's letters and medical source statement are brief and conclusory and did not include any supporting tests or examinations, the ALJ could discount Psychologist's opinions for lacking "any substantive explanation." *See Foster*, 410 F. App'x at 833 (agreeing with the magistrate judge's conclusion that the ALJ did not err in assigning only little weight to a brief and conclusory opinion). Therefore, the ALJ properly considered Psychologist's opinions in her letters and medical source statement.

The ALJ's reasons for discounting Psychologist's opinions in her letters and medical source statement, combined with his review and analysis of the objective record, satisfy his duty under the regulations. *Stephens*, 2020 WL 7122860, at *8 (finding that the ALJ's decision reflects he detailed the reasons why he found the overall evidence, including Dr. Pak's physical assessment, the objective medical evidence, and the course of treatment, unsupported and inconsistent with Plaintiff's subjective allegations of disabling limitation).

### 2. *Neuropsychologist's Evaluations*

Neuropsychologist examined Plaintiff in person twice. (doc. 11-1 at 24-26, 30-31.) In January 2018, he was administered the WAIS-IV and obtained a verbal comprehension index of 95, perceptual reasoning index of 86, working memory index of 80, processing speed index of 84, and full scale IQ of 84. (*Id.* at 24-25 (citing *id.* at 317-25.)) He demonstrated "grossly intact performances" on tasks of effort and motivation, his intellectual functioning was "low average and commensurate with a premorbid estimate", and "[o]verall, his cognitive profile reflected both frontal subcortical and cortical features." (*Id.* at 25 (citing *id.* at 324.)) She diagnosed him with a mild cognitive impairment, although she opined that the extent to which his symptoms were impacted by his childhood history of traumatic brain injury, vascular risk issues, "psychiatric overlay", and hearing impairment was unclear. (*Id.*) She made observations and recommendations, including that he give himself additional time, check himself for errors, reduce distractions when needing to focus, and employ alternative strategies for remembering information, i.e., the use of verbal repetition, lists, calendars, notes, and a daily planner. (*Id.* at 324-25.)

At a second examination with Neuropsychologist on April 24, 2019, Plaintiff endorsed severely elevated symptoms of depression and anxiety. (*Id.* at 30 (citing *id.* at 594-600.) He reported an ability to perform activities of daily living independently, including driving, although

his wife drove most of the time. (*Id.* at 30 (citing *id.* at 595.)) Compared to previous testing, his performances were "relatively stable, including relatively stronger verbal skills when compared to his visuospatial functions", except for borderline impaired naming, which was stable. (*Id.* (citing *id.* at 597-99.) Alzheimer's disease did not appear to be a "primary etiological rule-out", as his PET study results were not thought to be consistent with it. (*Id.* (citing *id.* at 599.)) She continued his diagnosis of mild cognitive impairment, even if some test performances suggested increased functional issues. (*Id.* (citing *id.* at 594-99.) She again made some recommendations. (*Id.* at 600.) Still noting that Plaintiff's variable attention and processing speed affected his ability to learn and recall new information, Neuropsychologist concluded both evaluations by recommending that Plaintiff "allow himself additional time, check himself for errors, and reduce distractions when needing to focus, as well as employ alternative strategies for remembering information, including use of verbal repetition, lists, calendars, notes, emails, and alarms". (*Id.* at 600.)

The ALJ found Neuropsychologist's findings "persuasive" because they were consistent with one another and with the medical evidence of record. (*Id.* at 31 (citing *id.* at 317-25, 594-600.)) He noted, for example, that both evaluations revealed that most aspects of Plaintiff's daily functioning were "relatively intact" during this period, and that the second evaluation continued Plaintiff's diagnosis received at the first evaluation. (*Id.* at 24-25 (citing *id.* at 378, 599.)) He also noted that Neuropsychologist's evaluations and Neurologist's opinions both showed mild cognitive improvement. (*Id.* at 30 (citing *id.* at 590, 599.)) Notably, Neuropsychologist made the same recommendations in each evaluation as to work functions, including that he allow himself more time, check his work, and use calendars or lists for remembering information. (*Id.* at 324-25, 600.)) She based her opinions on two in-person visits and, as the ALJ specifically noted, cognitive testing. (*Id.* at 25, 30 (citing *id.* at 317-25, 594-600.) The ALJ noted, however, that

40

Neuropsychologist's evaluations lacked concrete functional limitations, which reduced their probative value to some extent. (*Id.* at 31 (citing *id.* at 317-25, 594-600.)) Because the regulations require only that the ALJ "explain how []he considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in h[is] determination or decision," he properly evaluated Neuropsychologist's evaluation. 20 C.F.R. § 404.1520c(b)(2); *Williams v. Kijakazi*, No. 3:20-CV-3222-M-BH, 2022 WL 3045752, at *9 (N.D. Tex. July 6, 2022), *report and recommendation adopted*, No. 3:20-CV-3222-M-BH, 2022 WL 3042961 (N.D. Tex. Aug. 2, 2022) (citation omitted).

The ALJ's reasons for finding Neuropsychologist's opinions "persuasive" (with reduced probative value due to the lack of concrete functional limitations), combined with his review and analysis of the objective record, satisfy his duty under the regulations. *See Williams*, 2022 WL 3045752, at *9 (finding that the ALJ's discussion shows she specifically considered that Dr. Shade supported his opinion with a physical examination of Plaintiff and imaging, but the opinion was inconsistent with Plaintiff's own testimony that he helped with chores and drove).

In conclusion, the ALJ specifically stated he considered the opinion evidence and prior administrative medical findings in accordance with the requirements of 20 C.F.R. § 1520c, and he specifically considered supportability and consistency, the two most important factors in evaluating the persuasiveness of medical opinions. (doc. 11-1 at 29.) In particular, he noted that Psychologist's opinions were inconsistent with and unsupported by the objective evidence, including Plaintiff's report of his activities of daily living and the evaluations of Neuropsychologist and Neurologist, which that showed he was capable of greater mental functions. (*Id.* at 30-31 (citing *id.* at 317-25, 590, 594-601, 605-09.)) The ALJ also found that Neuropsychologist's evaluations were based on cognitive testing and were consistent with each other and with

41

Neurologist's evaluation, but the lack of concrete functional limitations reduced their probative value to some extent. (*Id.* at 31 (citing 317-25, 594-601.)) Because the regulations require only that the ALJ "explain how []he considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in h[is] determination or decision," he properly evaluated the opinions of Psychologist and Neuropsychologist. 20 C.F.R. § 404.1520c(b)(2); *see Williams*, 2022 WL 3045752, at *9 (finding that the ALJ properly found the consultative examiner's assessment "partially persuasive" where she specifically stated his opinion was inconsistent with plaintiff's own testimony and had "some" support for the RFC, which was supported by the longitudinal evidence of record).

Because "the ALJ properly considered [Psychologist and Neuropsychologist]'s opinions, and his RFC determination was based on the medical evidence in the record, … his RFC determination is supported by substantial evidence. *See Benson*, 2022 WL 868706, at *16 (citation omitted). Remand is not required on this basis.

## E. **Mental RFC Assessment**

Plaintiff argues that the ALJ's mental RFC did not incorporate his functional limitations relating to his "executive function, concentration/pace, speed, errors, mood symptoms, absences and off task behavior", as indicated in Neuropsychologist's "recommendations".[34] (doc. 20 at 18.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). The RFC

---

[34] Plaintiff references "neuropsychiatric" recommendations, but since the record does not contain a medical record by such a provider, it appears he intended to reference the recommendations within one or both neuropsychological evaluations. (Compare doc. 20 at 18 with doc. 11-1 at 317, 594.) Because he did not identify any recommendation or evaluation, both sets of recommendations are considered. (*See id.* at 324-25, 600.)

determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision or all the evidence that he rejected. *Falco*, 27 F.3d at 164. A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their

43

judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1. *Functional Limitations*

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and "[a]fter careful consideration of the entire record", the ALJ determined that prior to July 18, 2019, he had the RFC to perform a full range of work at all exertional levels with the following "nonexertional" limitations: he could adapt to changes, respond to customary work pressures in a routine environment with limited judgment and discretion, and understand, remember and carry out simple tasks; he could have occasional contact with the general public (but no customer service or problem solving tasks) and frequent contact with coworkers and supervisors (but occasional tandem tasks or teamwork); and he should not work at a "fast production-rate pace" like an assembly line. (doc. 11-1 at 28-29.)

The limitations identified in paragraph B of the technique "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011) (citing SSR 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996)). The mental RFC assessment requires a more detailed analysis in which the ALJ itemizes the various functions found in paragraphs B and C of the adult mental disorders listings and expresses them in terms of work-related functions, including "the abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *See* SSR 96-8P, 1996 WL 374184 at *4-6. Although the ALJ must consider the claimant's paragraph B functional limitations

when determining the mental RFC, he is not required to incorporate them into his RFC assessment "word-for-word." *Berry*, 2013 WL 524331, at *22 (citing *Westover*, 2012 WL 6553102, at *8; *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *20 (N.D. Tex. Feb. 9, 2011)).

   2.   *Concentration, Persistence and Pace*

Based on the medical and other evidence, and particularly Neuropsychologist's evaluations, the ALJ considered that Plaintiff had difficulty with attention, concentrating, completing tasks, and following rules, beginning in October 2017. (*Id.* at 28 (citing *id.* at 46-48, 217, 317-25.)) He further considered Plaintiff's diagnosis of mild cognitive impairment in January 2018, and his improved or stable test performance on a second neuropsychological evaluation in April 2019. (*Id.* at 28 (citing *id.* at 594-600.)) Both evaluations revealed that most aspects of his daily functioning were "relatively intact" during this period. (*Id.* at 24-25 (citing *id.* at 378, 599.)) Neuropsychologist opined in the second evaluation, however, that Plaintiff's diagnosis was still appropriate, and she advised continued monitoring over time for a possible progression of cognitive decline. (*Id.* at 26 (citing *id.* at 599.)) Noting that Plaintiff's variable attention and processing speed affected his ability to learn and recall new information, Neuropsychologist concluded both evaluations by recommending that he "allow himself additional time, check himself for errors, and reduce distractions when needing to focus, as well as employ alternative strategies for remembering information, including use of verbal repetition, lists, calendars, notes, emails, and alarms". (*Id.* at 600.) The ALJ accepted Neuropsychologist's findings because they were consistent with one another and with the medical evidence of record. (*Id.* at 31 (citing *id.* at 317-25, 594-600.)) The ALJ noted, however, that the absence of concrete functional limitations reduced their probative value to some extent. (*Id.* at 31 (citing *id.* at 317-25, 594-600.)) He found the opinions of SAPCs Geary and Boulos-Sophy "somewhat persuasive" because they were

"consistent" with the medical evidence of record as a whole and "commensurate" with Plaintiff's reported daily activities. (*See id.* at 31 (citing 265-71)). He expressly limited Plaintiff to "understanding, remembering and carrying out *simple tasks*", however, instead of "detailed, noncomplex instructions", as they had opined. (*Compare id.* at 31 (*citing id.* at 84, 99), *with id.* at 28-29 (emphasis added)).

The ALJ discounted Psychologist's letters and medical source statement because they were unsupported by, and inconsistent with, the objective evidence. (*Id.* (citing *id.* at 413-41, 415-41, 456-87.)) He discounted PCP's statements for the same reasons, although he accepted her opinion that Plaintiff could not perform the tasks required in his past work. (doc. 11-1 at 31). To the extent that Plaintiff argues that PCP's "medical opinions were not fully considered", (*see* doc. 20 at 17), "[t]he Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are brief and conclusory, and lack explanatory notes or supporting objective tests and examinations". *See Heck*, 674 F. App'x at 415.

The evidence shows that the ALJ considered and incorporated into his RFC assessment Plaintiff's moderate limitation in concentrating, persisting and pace by finding he could:

> respond to customary work pressures in a *routine environment with limited judgment and discretion, and understand, remember and carry out simple tasks*; and he could have occasional contact with the general public (but no customer service or problem solving tasks) and frequent contact with coworkers and supervisors (but occasional tandem tasks or teamwork), and he *should not work at a "fast production-rate pace"* like an assembly line.

(*Id.* at 24-32) (emphasis added).[35] Because "[t]he ALJ is solely responsible for determining a claimant's RFC, including whether to accept or reject medical opinions on a claimant's ability to perform work-related activities", he was free to discount or ignore Neuropsychologist's opinions.

---

[35] Of all of Neuropsychologist's recommendations, this appears to be the only one that relates to work functions. (*See* doc. 11-1 at 324-25, 600.) It is therefore the only one discussed in the functional limitations analysis.

*See McCool v. Saul*, No. 3:19-CV-00393, 2020 WL 4905501, at *3 (S.D. Tex. Aug. 20, 2020), *report and recommendation adopted*, No. 3:19-CV-00393, 2020 WL 5518626 (S.D. Tex. Sept. 14, 2020) (citing *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012)). Ultimately, substantial evidence in the record supports the ALJ's finding that Plaintiff's moderate limitation in maintaining concentration, persistence, or pace restricted his RFC only to the extent that he could understand, remember, and carry out simple tasks, and he should not work at a "fast production-rate pace" like an assembly line. *See Hamilton-Provost v. Colvin*, 605 F. App'x 233, 239 (5th Cir. 2015) ("Substantial evidence in the record supports the ALJ's decision, including the August 2004 report (noting that [plaintiff]'s memory, attention, concentration, insight, judgment, and ability to relate to others and sustain work were all fair) and the September 2004 examination (assessing his functioning as moderately impaired but giving a fair prognosis)."); *see also Westover v. Astrue*, No. 4:11-CV-816-Y, 2012 WL 6553102, at *9 (N.D. Tex. Nov. 16, 2012) (holding that substantial evidence supported the ALJ's RFC assessment that limited the claimant "to only performing work that involved detailed instructions," despite his moderate limitation in maintaining concentration, persistence, or pace, where the ALJ made that determination "based upon [his] evaluation of the evidence"). Remand is not required on this basis[36] and he has not shown that it is warranted on any

---

[36] Plaintiff also argues that "the nature of the claimant's medical impairments indicate[s] difficulty in maintaining employment, and that is not addressed", but he did not list this argument as one of his issues for review or separately brief it, as required by the scheduling order. (doc. 20 at 17.) It appears that this argument was made in support of his claim that the ALJ erred in failing to incorporate his moderate limitation in concentrating, persisting, and pace. (*See* doc. 20 at 17-18.) A specific finding is required only "if there is 'evidence that [the] claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *Tammy M. v. Berryhill*, No. 3:18-CV-1659-K (BH), 2019 WL 2107564, at *13 (N.D. Tex. Apr. 24, 2019), *report and recommendation adopted sub nom. McCann v. Berryhill*, No. 3:18-CV-1659-K, 2019 WL 2103687 (N.D. Tex. May 14, 2019) (citing *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003)). Even if this argument is separately considered as an issue, Plaintiff has not presented any evidence that his ability to maintain employment would be compromised by his mental impairments, or that the ALJ did not appreciate that the ability to perform work on a regular and continuing basis was inherent in the definition of RFC. (*See* doc. 20 at 17-18.) An express finding by the ALJ was therefore not required, and substantial evidence supports the ALJ's decision. *See James v. Astrue*, No. CIV.A. 11-484-DLD, 2012 WL 4159326, at *3-5 (M.D. La. Sept. 18, 2012)

other basis.

## IV.    RECOMMENDATION

The Commissioner's decision should be **AFFIRMED.**

**SO RECOMMENDED** on this 31st day of August, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

(determining that the plaintiff's symptoms of depression and/or anxiety did not wax and wane such that her ability to maintain employment was compromised); *see also Beale v. Colvin*, No. 3:15-CV-2736-BH, 2016 WL 5348717, at *15 (N.D. Tex. Sept. 22, 2016) (finding that the ALJ was not required to make a finding that the plaintiff could maintain employment).